THE HONORABLE BENJAMIN H. SETTLE

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
## AT TACOMA

| | |
|---|---|
| AARON PAUL KHAMNOY, <br><br> Plaintiff, <br><br> v. <br><br> NATIONAL RAILROAD PASSENGER CORPORATION, d.b.a. AMTRAK; and DOES ONE THROUGH FIFTY. <br><br> Defendant. | **NO. 3:19-cv-06223-BHS** <br><br> **DECLARATION OF JOHN CARY** |

I, John R. Cary, do hereby declare as follows:

1.     I am of legal age, competent to testify to the matters herein, and do so on my own personal knowledge.

2.     All opinions expressed by me in my July 12, 2021 Vocational Assessment and the Preliminary Life Care Plan tables for Mr. Khamnoy are to a reasonable degree of professional probability and certainty.

3.     In arriving at any opinions expressed in my July 12, 2021 Vocational Assessment and the Preliminary Life Care Plan tables for Mr. Khamnoy, I relied on my

**GRUBE OREHOSKI, PLLC**
1200 FIFTH AVE., STE 1711, SEATTLE, WA 98101
(206) 770-7606 | (206) 770-7607 (FAX)

specialized knowledge, training, education and experience, my review of published literature, my thorough review of all relevant medical bills and medical records, my interview with Mr. Khamnoy, and consultation with Raj Kakarlapudi, MD.

4.     In advance of responding to the Defense's motion, I offer the following relevant facts related to my education, training and experience as it pertains to background and methodology in arriving at my opinions in this matter. The specifics of my credentials, publications, and clinical experience are set forth in my CV, a current copy of which is attached as Exhibit 1 to my declaration.

5. ...............................................................................................I obtained a Masters Degree in Rehabilitation Counseling from Western Washington University in 2014 and was designated the inaugural Woodring College of Education Rehabilitation Counseling Award for Outstanding Graduate Student this same year.

6. ...............................................................................................I am a Certified Rehabilitation Counselor and Certified Disability Management Specialist. These are national certifications, independently accredited, with standards of practice and codes of ethics. The governing commissions for each certificate are nonprofit organizations. The duty of certification agencies and their accreditation body is to assure the public that specific standards and quality of services are met.

7. ...............................................................................I am a member of professional associations for the purpose of continuing education and staying current on developments in accepted standards of practice and methodologies in my field. This includes my longstanding membership with the International Association of Rehabilitation Professionals (IARP) and the Life Care Planning section of IARP, the International Academy of Life Care

GRUBE OREHOSKI, PLLC
1200 FIFTH AVE., STE 1711, SEATTLE, WA 98101
(206) 770-7606 | (206) 770-7607 (FAX)

Planners (IALCP).

8. ...................................................................................... I have been published in peer-reviewed journals including the Rehabilitation Professional, Journal of Life Care Panning, and the Journal of Forensic Vocational Analysis. I have spoken at local and national seminars on issues of rehabilitation counseling and case management, including presenting at the IARP 2021 Virtual Conference on proper methodology as it relates to information on the subject that has been published in peer-reviewed journals and is generally accepted in the field.

9. ...................................................................................... I     am employed by OSC Vocational Systems, Inc., established in 1981. Representative of our emphasis as a firm on clinical work, we receive over 1,000 rehabilitation referrals from the State of Washington each year. These are clinical rehabilitation referrals and not inclusive of additional rehabilitation referrals from employers, private individuals, or complex medical case management cases. Each of these clinical cases includes a diverse array of coordination of care and comprehensive assessment using generally accepted and standardized methodology.

10. ...................................................................................... Currently we have over 120 clients in vocational retraining plan development and over 60 clients in active vocational rehabilitation retraining plans, for which we are involved in the development, implementation and coordination of services aimed at returning those people to work. It is important to note that the number of active retraining plans is approximately 50% of what would be typical, primarily due to the Covid-19 pandemic.

DECLARATION OF JOHN CARY
3:19-CV-06223-BHS
3 OF 26

**GRUBE OREHOSKI, PLLC**
1200 FIFTH AVE., STE 1711, SEATTLE, WA 98101
(206) 770-7606 | (206) 770-7607 (FAX)

11.................................................................................................I have supervised and trained vocational rehabilitation counselors, case managers and interns since 2009, all of whom provide rehabilitation and case management services in a clinical capacity.

12.................................................................................................I am a recent past practicum and internship site supervisor for Woodring College of Education Master's in Rehabilitation Counseling program at Western Washington University.

13.................................................................................................In addition to my education and certifications, I have over 16 years of experience in the medical and psychosocial aspects of disability working with, and assessing individuals with a wide variety of injuries and disabilities in a clinical capacity with direct involvement in their rehabilitation and coordination of care.

14.................................................................................................My expertise in the areas of the medical and psychosocial aspects of disability informs my understanding of the practical day-to-day implications of conditions as diagnosed and determined by physicians and other qualified medical providers, including but not limited to, psychologists, physical therapists, occupational therapists and speech and language therapists. I have an understanding of the impact of these conditions as diagnosed by qualified medical providers on the individual's day-to-day life involving areas of treatment, independent living, work, transportation, equipment, medications, supplies, as well as life roles as members of society.

15.................................................................................................As a case manager I actively assist in the development, coordination and implementation of case management plans for injured individuals. These cases range from pediatric to geriatric and

GRUBE OREHOSKI, PLLC
1200 FIFTH AVE., STE 1711, SEATTLE, WA 98101
(206) 770-7606 | (206) 770-7607 (FAX)

from traumatic brain injuries to spinal cord injuries in complexity. These individuals vary in education, employment background, internal[1]/external[2] diversity, as well as medical conditions. This is representative of my day-to-day clinical rehabilitation counseling and case management work outside of litigation.

16.     The overwhelming focus of my work is clinical case management services, clinical vocational rehabilitation counseling, and coordination of services for individuals with disabilities, their families, medical providers, rehabilitation providers, and employers.  It is the specifics of my day-to-day clinical activity, in addition to my education, training and certifications, which informs the development of my specialized knowledge.

17.     Representative of the longstanding role of rehabilitation counselor's as coordinators of care, McGowan & Porter (1967)[3] establishes rehabilitation counselors as experts in the coordination of care and variety of services. McGowan & Porter (1967) note this requires rehabilitation counselors possess a multitude of skills based on a wide range of training and many general and specialized abilities in at least two or more disciplines.

18.      The basics of case management and life care planning were initiated by several pieces of legislation that began in 1917 with the Smith-Hughes Act, and continued into the 1960s and 1970s with major legislation that provided services for people with disabilities. The range of

---

[1] Characteristics a person is born into (e.g. race, ethnicity, age, national origin, sexual orientation, cultural identity, gender identity, pre-morbid physical and mental ability)

[2] Aspects of a person that can change and often do over time (e.g. personal interests, appearance, citizenship, religious beliefs, location, familial status, relationship status, socioeconomic status, and life experiences.)

[3] *McGowan, J.F., & Porter, T.L. (1967). An Introduction to the Vocational Rehabilitation Process. A Training Manual. Rehabilitation Service Series No. 68-32.*

GRUBE OREHOSKI, PLLC
1200 FIFTH AVE., STE 1711, SEATTLE, WA 98101
(206) 770-7606 | (206) 770-7607 (FAX)

modern day rehabilitation services include full evaluation, counseling and guidance, medical services and care, prosthetics, vocational training, services through rehabilitation facilities, maintenance and transportation, tools and equipment, and placement services.

19.     The methodology utilized and work performed to assess the ability to live independently, work, and sustain employability does not vary in practice. It is consistent with, and predicated on, established, published and generally accepted methodology and standards of practice in the field of rehabilitation counseling and case management.

20.     Rehabilitation counselors and case managers look to the medical community to outline and define the nature and extent of impairment. They then correlate impairment and impact to employability, earnings, other roles of life, costs of care and independent living.

21.     Understanding the nature and extent of Mr. Khamnoy's impairments allows someone with my training and clinical experience to coordinate care and assess employability. My background, including 16 years of ongoing clinical experience provide me with the ability to assess the functional and emotional sequela of Mr. Khamnoy's injuries and translate those impairments to his ability to obtain and maintain appropriate work available in his geographic labor market and his ability to live independently, in the least restrictive environment, with consideration to his needs and human dignity.

22.     Specifically, in this matter I was contacted by Plaintiff's counsel to assist with coordination of a Life Care Plan (a long standing tool of case management involving coordination of care for those injured and ill) for Mr. Khamnoy, evaluate and determine the reasonableness of his past medical bills, and to assess the presence of lost earnings capacity related to Mr. Khamnoy's December 18, 2017 injuries and sequelae.

23.     In completing my work, I have clinically interviewed Mr. Khamnoy, reviewed

GRUBE OREHOSKI, PLLC
1200 FIFTH AVE., STE 1711, SEATTLE, WA 98101
(206) 770-7606 | (206) 770-7607 (FAX)

his medical bills and medical records, I have discussed Mr. Khamnoy's future prognoses with Dr. Kakarlapudi and I have looked to the medical community to define the nature and extent of Mr. Khamnoy's impairment. I then translated those limitations and recommendations to the world of work, independent living, coordination of future medical and rehabilitation services and the costs associated to promote quality of life in the least restrictive environment with consideration to Mr. Khamnoy's unique individual needs. Additionally I have determined the impact of his injuries on his earning capacity.

24.     I have been asked to review and respond to the material aspects of the Defense's December 13, 2021 motion in limine as it pertains to my opinions.

25.     All responses by me herein are to a reasonable degree of professional probability and certainty and are expressed based on my specialized knowledge, training, education and experience, my review of published literature, my thorough review of all relevant medical records combined with my clinical judgment.

26.     **The Defense asserts:** "Mr. Cary's reliance on Dr. Raj Kakarlapudi should be limited to orthopedics…Dr. Kakarlapudi is a board certified orthopedic surgeon. He is not a neurologist or a psychiatrist or even a psychologist. Yet, Mr. Cary consulted Dr. Kakarlapudi regarding issues relating to neurology and psychiatry and psychotherapy. For example, Mr. Cary consulted with Dr. Kakarlapudi regarding post-concussion syndrome, headaches, and emotional responses related to the derailment…All future medical treatment not supported by the record should be excluded. Mr. Cary's opinions and the Preliminary Life Care Plan must be based on 'reliable principles and methods' reliably applied to the facts of this case…Mr. Cary does not cite to the medical records that recommend such future treatments, and no health care provider has specifically recommended such future treatments. Accordingly, these items should be

GRUBE OREHOSKI, PLLC
1200 Fifth Ave., Ste 1711, Seattle, WA 98101
(206) 770-7606 | (206) 770-7607 (fax)

excluded."

27.     **Response:** In keeping with standard methodology and Life Care Planning Standards of Practice, I have appropriately looked to the medical community through review of medical records and consultation with Dr. Kakarlapudi to define the nature and extent of Mr. Khamnoy's impairments.

28.     In cases involving litigation, and those not, a medical or other expert opinion outside the scope of practice of the rehabilitation counselor or case manager is obtained by the rehabilitation counselor or case manager, either through consultation or as identified in the medical records. Our standards of practice dictate that we rely on information from physicians and other foundational experts, for their opinions and prognosis while utilizing our training in the medical and psychosocial aspects of disabilities to identify the impact on various life roles including independent living, community roles, and ability to earn money for a living.

29.     With respect to the example the Defense provides related to "consulting with Dr. Kakarlapudi regarding post-concussion syndrome, headaches, and emotional responses related to the derailment…" this is an inaccurate representation of what Mr. Khamnoy's July 2021 Preliminary Life Care Plan actually reflects.

30.     Consistent with our standards of practice, page 1 of the July 2021 Preliminary Life Care Plan tables expressly references medical chart notes of Neurologist, Satish Gaddam, MD, and his diagnoses of Post-concussion Syndrome, Headache, Cervical and Lumbar Radiculopathy, as diagnosed by Dr. Gaddam on April 10, 2019. Also included is further reference to Dr. Gaddam's treatment recommendations for the conditions he diagnosed.

31.     Additionally noted on page 1 of the July 2021 Preliminary Life Care Plan per my July 6, 2021 clinical interview with Mr. Khamnoy, Mr. Khamnoy's report of symptoms is

**GRUBE OREHOSKI, PLLC**
1200 FIFTH AVE., STE 1711, SEATTLE, WA 98101
(206) 770-7606 | (206) 770-7607 (FAX)

consistent with what Dr. Gaddam notes of his diagnoses: Mr. Khamnoy is experiencing ongoing daily headaches ranging form 3-4 out of 10 and up to 5 to 7 out of 10 with stress or having to focus, concentrate, or recall memories.

32.     Based on the established diagnoses of Dr. Gaddam, reports of ongoing symptomology from Mr. Khamnoy, and consultation with Dr. Kakarlapudi, a very conservative recommendation for a minimum of one follow-up evaluation with neurology was recommended, with the expectation of any additional treatment recommendations to be determined upon evaluation by a neurologist.

33.     The inclusion of a neurology follow up and the other items in the July 2021 Preliminary Life Care Plan referenced in the Defense's motion are consistent with the Life Care Planning Standards of Practice and are grounded in reliable methods based on applied facts specific to Mr. Khamnoy and the sequelae of his injuries and are supported by his medical records and consultation with Dr. Kakarlapudi.

34.     **The Defense asserts**: I list numerous items such as "…psychiatric evaluation, monitoring and treatment; psychotherapy evaluation, monitoring, and treatment; occupational therapy evaluation, monitoring, and treatment; and physical therapy evaluation, monitoring, and treatment." The Defense goes on to assert that I do not "cite the medical records that recommend such future treatments, and no health care provider has specifically recommended such future treatments. Accordingly, these items should be excluded."

35.     **Response:** I possess expertise with respect to the medical and psychosocial aspects of disability and understanding of the practical day-to-day implications of conditions as diagnosed and determined by physicians and other qualified medical providers, including but not limited to, psychologists, physical therapists, occupational therapists and speech and

**GRUBE OREHOSKI, PLLC**
1200 FIFTH AVE., STE 1711, SEATTLE, WA 98101
(206) 770-7606 | (206) 770-7607 (FAX)

language therapists.

36.     I have an understanding of the impact of these conditions on the individual's day-to-day life involving areas of treatment, independent living, work, transportation, equipment, medications, supplies, recreation and leisure, and the consequences of psychosocial disability (mental health conditions) related to concerns and barriers to life roles, challenges accessing activities of daily living, and the broader implications as a contributing member of society.

37.     For the inclusion of each item in the July 2021 Preliminary Life Care Plan, I have appropriately considered and relied upon Mr. Khamnoy's medical records, his report of symptoms as referenced in our clinical interview and in his December 8, 2020 sworn testimony, and my consultation with Dr. Kakarlapudi.

38.     More specifically, with regard to the inclusion of a psychiatric evaluation, monitoring and treatment and psychotherapy evaluation, monitoring, and treatment, Mr. Khamnoy testified that he has not had money to pay for a counselor or psychiatrist[4].

39.     Mr. Khamnoy testified that he experiences difficulty sleeping, struggles of feelings of wanting to cry, and having nightmares associated with his injury event.[5]

40.     To the extent that Mr. Khamnoy's injuries have altered his monastic way of life, Mr. Khamnoy testified that pain has diminished his duties as a Deputy Monk[6], pain interferes

---

[4] Deposition of Aaron Khamnoy, Page 28 lines 13-17

[5] Deposition of Aaron Khamnoy, Page 31 lines 16-25

[6] Deposition of Aaron Khamnoy, Page 14 lines 10-13

GRUBE OREHOSKI, PLLC
1200 FIFTH AVE., STE 1711, SEATTLE, WA 98101
(206) 770-7606 | (206) 770-7607 (FAX)

with his ability to pray and meditate[7], and that pain has caused Mr. Khamnoy to contemplate how much longer he can remain a monk in temple[8].

41.     According to my July 6, 2021 clinical interview with Mr. Khamnoy, he struggles with chronic pain, intense feelings of anxiety and fear around seeing or thinking about trains and managing intrusive thoughts or recollections of his injury event. He reports tending to cry when thinking about his injuries and that intrusive nightmares about his injury event have been pervasive. When discussing the emotional responses to his injuries Mr. Khamnoy was crying in our clinical interview and stated, *"I wish I can go back to normal"*.

42.     Furthermore, chronic pain related to polytrauma was a prevalent feature throughout the medical records reviewed; including the most recent record I reviewed by Dr. Kakarlapudi dated January 13, 2020, which indicates persistent pain in the neck, mid-back, low back, and right knee.

43.     It is very well known in the field of rehabilitation counseling and case management, with respect to the medical and psychosocial aspects of disability, chronic pain and protracted emotional responses to trauma are often factors in to the chronicity of disability, which requires carful consideration with respect to the coordination of care[9].

44.     There is a large body of academic literature that discusses the mind body connection and the psychological effects of chronic pain. Representative of this correlation, the Journal of the American Academy of Orthopaedic Surgeons published an article by Kang et al.

---

[7] Deposition of Aaron Khamnoy, Page 15 lines 9-11

[8] Deposition of Aaron Khamnoy, Page 17 lines 2-9

[9] Marini, I., Glover-Graf, N. M., & Millington, M. J. (2012). Psychosocial aspects of disability: Insider perspectives and counseling strategies. Springer Publishing Co.

**GRUBE OREHOSKI, PLLC**
1200 FIFTH AVE., STE 1711, SEATTLE, WA 98101
(206) 770-7606 | (206) 770-7607 (FAX)

(2021)[10] which discusses the link between the prevalence of psychological effects after orthopaedic trauma. Kang et al. (2021) ultimately recommend raising awareness among the orthopaedic community to improve post-treatment planning, increase referrals to appropriate non-medical professionals (e.g. counselors, therapists, and psychologists), and implement earlier effective interventions after orthopaedic trauma (e.g. individual counseling).

45.     Based on these facts identified from my review of Mr. Khamnoy's medical and other records, my clinical interview of Mr. Khamnoy, my understanding of the academic literature, and my through consultation with Dr. Kakarlapudi on July 9, 2021, treatment for protracted emotional response related to Mr. Khamnoy's December 18, 2017 injuries and sequela was appropriately recommended.

46.     The recommended treatment is conservative and equates to a referral from Dr. Kakarlapudi to a psychiatrist (i.e. a minimum of one evaluation, with treatment recommendations pending the outcome of the psychiatric evaluation) and one to two full courses of individual counseling (i.e. a minimum of 12 to 24 visits, with additional treatment recommendations pending the outcome of psychiatric evaluation).

47.     With regard to the inclusion of physical therapy evaluation, monitoring, and treatment, the Defense neglects to note that Dr. Kakarlapudi has recommended physical therapy to follow a spinal surgery he recommended, as outlined in Dr. Kakarlapudi's January 13, 2020 medical chart note. This fact is clearly indicated in the July 2021 Preliminary Life Care Plan, which states physical therapy is to occur "Approximately 6 Weeks Post Lumbar Laminectomy

_____

[10] Kang KK, Ciminero ML, Parry JA, Mauffrey C. The Psychological Effects of Musculoskeletal Trauma. J Am Acad Orthop Surg. 2021 Apr 1;29(7):e322-e329. doi: 10.5435/JAAOS-D-20-00637. PMID: 33475305.

GRUBE OREHOSKI, PLLC
1200 FIFTH AVE., STE 1711, SEATTLE, WA 98101
(206) 770-7606 | (206) 770-7607 (FAX)

Revision Surgery for Approximately 6 Weeks" for an "Average 3 Times Per Week". This was Dr. Kakarlapudi's post surgical rehabilitation recommendation based on a surgery that he has deemed medically necessary. Additionally, a minimum of one evaluation by an Occupational Therapist was recommended by Dr. Kakarlapudi, which equates to a referral to assess the efficacy and need for additional occupational therapy treatments going forward.

48.     The inclusion of a psychiatric evaluation, individual counseling, physical and occupational therapy in the July 2021 Preliminary Life Care Plan are consistent with the Life Care Planning Standards of Practice and are grounded in reliable methods based on applied facts specific to Mr. Khamnoy and the sequelae of his injuries. Moreover, the inclusion of these items are further supported by the medical and other records reviewed and my consultation with Dr. Kakarlapudi.

49.     **The Defense asserts:** "Also listed in the Preliminary Life Care Plan are right shoulder treatment/surgeries that are "pending further evaluation" and "the cost is "indeterminate at this time…Again, Mr. Cary does not cite to the medical records that suggest that Plaintiff requires or may require right shoulder treatment, and no health care provider, including Dr. Kakarlapudi, has specifically recommended monitoring or evaluation for right shoulder surgery. The last medical record from Momentum Spine and Joint that Amtrak has is dated January 2020 and that record does not contain any information about continued evaluation for potential right shoulder surgery…Accordingly, any reference to or testimony about right shoulder treatment or surgery should be excluded."

50.     **Response:** The inclusion of additional consideration to Mr. Khamnoy's right knee and right shoulder are in the July 2021 Preliminary Life Care Plan based on foundation from Mr. Khamnoy's medical and other records, my clinical interview with Mr. Khamnoy, and

**GRUBE OREHOSKI, PLLC**
1200 Fifth Ave., Ste 1711, Seattle, WA 98101
(206) 770-7606 | (206) 770-7607 (fax)

my consultation with Dr. Kakarlapudi.

51.     MRI of the right knee was taken on April 11, 2018 and a post-traumatic anteromedial meniscus was identified.

52.     Dr. Choi noted on June 6, 2018 continued difficulties were reported with regard to driving, due in part to pain in the right knee. Dr. Choi opined that Mr. Khamnoy's right knee pain was a direct result of trauma resulting in inflammation/internal derangement as demonstrated on MRI.

53.     A chart note by Dr. Daniels of April 2, 2019 documented continued pain in the right knee.

54.     Dr. Chaudhry administered a right knee joint cortisone injection on June 14, 2018 and April 17, 2019.

55.     Per my July 6, 2021 clinical interview with Mr. Khamnoy, he relies on a cane to assist with ambulation. He reports having fallen while in the shower and has had other instances of nearly falling and catching himself.

56.     Per my July 6, 2021 clinical interview with Mr. Khamnoy, he experiences chronic right shoulder stiffness with numbness and tingling radiating down his right arm into his right hand and fingers. Mr. Khamnoy reports difficulty with grip strength in his dominant right hand that causes him to frequently drop items out of his hand.

57.     Furthermore, Mr. Khamnoy has very low health literacy and has difficulty advocating for himself and his medical care. In addition to cultural, religions, and language consideration, Mr. Khamnoy's low health literacy is well established through medical records from St. Joseph Medical Center dated December 18, 2017 by Nathaniel Schlicher, MD, which notes, *"He [Mr. Khamnoy] has never been to a hospital and does not have a medical history"*.

GRUBE OREHOSKI, PLLC
1200 FIFTH AVE., STE 1711, SEATTLE, WA 98101
(206) 770-7606 | (206) 770-7607 (FAX)

Mr. Khamnoy relies entirely on the laity for assistance with the coordination, interpretation, and transportation (for longer distances) related to his medical care. Mr. Khamnoy testimony makes clear he is not fully aware as to the administrative nuances and coordination of his medical care[11] and stated in our clinical interview that he lacked resources to access medical services.

58.     The inclusion of additional consideration to Mr. Khamnoy's right knee and right shoulder, including medical follow up and consideration to future right knee joint injection, and other treatments he has had in the past, pending the outcome of follow-up, are appropriately included the July 2021 Preliminary Life Care Plan. The recommendations are consistent with the Life Care Planning Standards of Practice and are grounded in reliable methods based on applied facts specific to Mr. Khamnoy and the sequelae of his injuries and are supported by the medical records reviewed and my consultation with Dr. Kakarlapudi.

59.     **The Defense asserts:** "All references to Assisted Living Facility should be excluded. In his Preliminary Life Care Plan, Mr. Cary opines that an Assisted Living Facility may be appropriate…No treating provider has ever made this recommendation. In making this opinion, Mr. Cary did not rely on any specific scientific theory, treatise, publication, or formula."

60.     **Response:** Johnson & Choppa (2016)[12] establish, "When coordinating home services for future care, the Rehabilitation Counselor and/or Case Manager may performance environmental assessment of the home and assess how the individual is impacted by their environment including what assistance, if any they require for the performance of independent

---

[11] Deposition of Aaron Khamnoy, Pages 28, 31, 34

[12] Choppa, N. & Johnson, C. B. (2016). The Use of the FCE in Estimation of Client Care and Services,. The Rehabilitation Professional, 24, (1), p.p. 31-36.

**GRUBE OREHOSKI, PLLC**
1200 Fifth Ave., Ste 1711, Seattle, WA 98101
(206) 770-7606 | (206) 770-7607 (fax)

activities of daily living, chores, maintenance, etc."

61.     As a rehabilitation counselors and case manager, I have a unique perspective for analyzing tasks and need. Part of my day-to-day clinical work involves analyzing individual tasks in job analyses and the analysis of an individual's ability to meet the essential functions of a job(s).

62.     Furthermore, as a rehabilitation counselors and case manager, I have a unique role in the coordination and implementation of case management plans, which includes the analysis of need and facilitation of household services and supportive living environment. This is a feature of my clinical work and informs my specialized clinical judgment.

63.     When coordinating home services and future care for Mr. Khamnoy, in keeping with methodology and standards of practice, I completed an environmental assessment of his current living situations, assessed how impairments defined by the medical community are impacted by his environment, and assessed if assistance now or in the future is required to access independent activities of daily living, completion of chores, household maintenance and upkeep, and other essential tasks associated with Mr. Khamnoy's daily adult responsibilities. (Johnson & Choppa, 2016)

64.     **The Defense asserts:** "The only basis for Mr. Cary's opinion that an assistive living facility may be appropriate is that Plaintiff "was concerned that he would be asked to leave" the Buddhist temple. "His plan was to be a monk and live in temple until death. He is unsure how long this will be an option for him secondary to his significant physical limitations. Mr. Khamnoy [Plaintiff] stated that at a certain point if a monk becomes ill and unable to contribute to the monastic duties in the temple they are sent to live with their family or a nursing home in the case when monks have no family. Mr. Khamnoy [Plaintiff] has family in the U.S.

GRUBE OREHOSKI, PLLC
1200 FIFTH AVE., STE 1711, SEATTLE, WA 98101
(206) 770-7606 | (206) 770-7607 (FAX)

but they are not close. He hopes his family will 'have the heart to accept him' into their home and take care of him if he is no longer able to stay in temple. …Mr. Cary's opinion is not based on any scientific theory, treatise, publication or formula."

65. **Response:** In addition to the methodology and published literature described in my response above, representative of the published literature that quantifies value of time associated with household services additional publications rehabilitation counselors and case managers may consider when recommending replacement of household services include: The American Time Use Survey (ATUS)[13] and The Dollar Value of a Day (DVD)[14].

66. It is important to note that it is my application of specialized knowledge, training and experience combined with my clinical judgment (Choppa et al., 2004)[15] and not simply relying on published data that is the basis for my opinions. While the publications referenced above are reliable sources, they do not consider any one individual or specific set of circumstances in the curation of their data. Simply superimposing data to Mr. Khamnoy's needs is not consistent with standard methodology and standards of practice (Choppa & Johnson, 2008)[16]. I have appropriately relied on the nature and extent of Mr. Khamnoy's medical and psychosocial impairments as defined by the medical community and derived from my clinical

---

[13] American Time Use Survey User's Guide: Understanding ATUS 2003 to 2020, Available at http://www.bls.gov/tus/atususersguide.pdf

[14] Kruger, K., & Ward, J. (2014). Expectancy Data: The dollar value of a day: 2013 dollar valuation. Shawnee Mission, KS.

[15] Choppa, A., Johnson, C. B., Fountaine, J., Shafer, K., Jayne, K., Grimes, J. W., & Field, T. F. (2004). The efficacy of professional clinical judgment: Developing expert testimony in cases involving vocational rehabilitation and care planning issues. *Journal of Life Care Planning, 3(*3), 131–150.

[16] Choppa, A., & Johnson, C. (2008). Response to estimating earning capacity: Venues, factors, and methods. *Estimating Earning Capacity Journal: A Journal of Debate and Discussion, 1*(1), 5–40.

**GRUBE OREHOSKI, PLLC**
1200 FIFTH AVE., STE 1711, SEATTLE, WA 98101
(206) 770-7606 | (206) 770-7607 (FAX)

interview of Mr. Khamnoy, along with my consultation with. Dr. Kakarlapudi, and in combination with my understanding of Mr. Khamnoy current living environment, his current support apparatus, his skills ability and the impact that his impairments have on his independence in a least restrictive environment.

67.    **The Defense asserts:** "Moreover, this opinion is nothing more than pure speculation about the future and is not supported by any medical testimony to the requisite standard of medical certainty. Mr. Cary's reference to the "RAPEL" methodology early on in his expert report…refers specifically to earning capacity and has nothing to do with medically determining whether an assistive living facility would be appropriate. As such, Mr. Cary's opinion regarding potential placement at an assistive living facility does not meet the first test under *Daubert* that the theory has been tested. Nor does Mr. Cary's opinion meet the second factor of *Daubert* because since there is no methodology, theory or technique which Mr. Cary applied to reach the conclusion that Plaintiff may need to live at an assisted living facility, the jury will be misled and confused. The risk of prejudice to Amtrak is great. Accordingly, all testimony and reference to an assisted living facility in Mr. Cary's report should be excluded."

68.    **Response:** All of my opinions are based on peer-reviewed and accepted methodology and standards of practice in my field.

69.    The defense is correct that I reference application of the RAPEL methodology[17] in addition to my knowledge, training and experience combined with my professional and

_____

[17] Weed, R. O., & Field, T. F. (2012). Rehabilitation consultant's handbook (4th Ed.). Athens, GA: Elliott & Fitzpatrick; Field, T.F. (2008). Estimating earning capacity: Venues, factors, and methods. Estimating Earning Capacity, 1(1), 5–40.; and Weed, R., & Field, T. (2001). Rehabilitation consultant's handbook (rev. ed.). Athens, GA: Elliott & Fitzpatrick;

**GRUBE OREHOSKI, PLLC**
1200 FIFTH AVE., STE 1711, SEATTLE, WA 98101
(206) 770-7606 | (206) 770-7607 (FAX)

clinical judgments. RAPEL is a mnemonic for (R)ehabilitation Plan; (A)ccess to the Labor Market (E)arnings Capacity, and Labor Force Participation. Where the Defense is mistaken is their assumption that the RAPEL methodology does not consider the medical and psychosocial aspects of disability in a Life Care Plan. The "R" in the RAPEL methodology mnemonic expressly addresses consideration to Life Care Plans and Vocational Rehabilitation Plans. More specifically, consideration to functional and emotional limitations and cognitive capabilities, when planning for, establishing, or increasing employment potential through training and accommodations, as well as identification of future needs through the development of a Life Care Plan. [18][19][20][21]

70.    Life care planning is a transdisciplinary specialty practice which has evolved over time for multiple purposes, including the identification of damages in civil cases. Outside of my clinical practice I have also been qualified as an expert witness in costs of care and Life Care Planning in numerous state and federal courts.

71.    Life Care Planning is a longstanding tool of case management used to coordinate current and future medical and rehabilitation needs and associated costs for people who

---

[18]Field (2008) refers to the RAPEL methodology as one of the most comprehensive models, as it considers resources and strategies from a variety of sources. Field, T.F. (2008). Estimating earning capacity: Venues, factors, and methods. *Estimating Earning Capacity*: *Journal of Debate and Discussion,* 1(1), 5–40.

[19]Weed & Field (2001 revised, 2012, 4th edition revised) conceptualize the RAPEL methodology as a "comprehensive approach which includes all elements needed to determine loss of access, loss of earnings capacity, future medical care, work life expectancy, rehabilitation plan, placeability, and employability factors".

[20]Weed R. & Field, T. (2001). *Rehabilitation consultant's handbook. Athens, GA: Elliot & Fitzpatrick.*

[21]Weed & Field, (2012). *Rehabilitation consultant's handbook. Athens, GA: Elliot & Fitzpatrick.*

DECLARATION OF JOHN CARY
3:19-CV-06223-BHS
19 OF 26

GRUBE OREHOSKI, PLLC
1200 FIFTH AVE., STE 1711, SEATTLE, WA 98101
(206) 770-7606 | (206) 770-7607 (FAX)

experience a serious injury or illness.

72.     A Life Care Plan is a dynamic, living, document based upon published standards of practice, comprehensive assessment, data analysis, and research which provides an organized, concise plan for current and future needs with associated costs, for individuals who have experienced catastrophic injury or have chronic health care needs. Its use has long preceded use in the litigation world.

73.     The current specialty practice of life care planning is comprised of case managers, rehabilitation counselors, nurses, physicians, occupational, physical and speech therapists, psychologists and others. From 1981 until 2017, subgroups have emerged within this specialty practice, forming their own professional identities, standards of practice, ethical codes and sometimes certifications. These groups have expanded upon the earliest life care planning standards of practice established by the International Academy of Life Care Planners, and have produced their own bodies of work.

74.     The inclusion of the replacement for household services, including assessing the need for assisted living, are appropriately included the July 2021 Preliminary Life Care Plan. The recommendations are consistent with the Life Care Planning Standards of Practice and are grounded in reliable methods based on applied facts specific to Mr. Khamnoy and the sequelae of his injuries and are supported by the medical records reviewed and my consultation with Dr. Kakarlapudi.

75.     **The Defense asserts:** "Mr. Cary is precluded from testifying about Plaintiff's future economic losses. Although Plaintiff has been a monk since he was in his teens and has never earned any wages, Mr. Cary attempts to opine regarding Plaintiff's future economic losses…For example, he will apparently attempt to offer the opinion that Plaintiff's future

**GRUBE OREHOSKI, PLLC**
1200 FIFTH AVE., STE 1711, SEATTLE, WA 98101
(206) 770-7606 | (206) 770-7607 (FAX)

economic losses are between $647,924.55 to $1,444,443, depending on whether Plaintiff was asked to leave the monastery – a wholly speculative premise in the first place…Additionally, Mr. Cary opines that the "replacement of services" that Plaintiff may be entitled to ranges between $1,809,631.03 and $3,350,341.23, depending on whether Plaintiff was asked to leave the monastery…This claim has no evidentiary support. Moreover, any such loss, if there is one, would be suffered by the monastery and not the Plaintiff. Therefore, it has no relevance to this action. Finally, Mr. Cary should not be allowed to offer these speculative opinions, which have no factual basis because Plaintiff has no earnings history and had no plans, regardless of the accident, to ever be gainfully employed."

76.     **Response:** I have been asked to provide a definition of vocational assessment, a description of what is involved with completing a vocational assessment and evaluation according to generally accepted and peer-reviewed methodology, my training, experience and clinical judgment.

77.     A vocational assessment is a determination of an individual's ability to work and earn money. The standard methodology requires an understanding of an individual's age, education, employment experience, skills, and earnings combined with any limitations they may have which may impede their ability to work and their wage earning capacity.

78.     Wage earning capacity can be defined as the wage that an individual is capable of earning based on a number of factors, such as skill, ability, education, work history, training, experience, physical capacity, the labor market, and their geographic area.

79.     Vocational experts rely on a holistic mixture of quantitative and qualitative analyses integrated with knowledge of the world of work, vocational education, and training, combined with clinical judgment.

**GRUBE OREHOSKI, PLLC**
1200 FIFTH AVE., STE 1711, SEATTLE, WA 98101
(206) 770-7606 | (206) 770-7607 (FAX)

80.     Through the use of well researched and time-tested vocational techniques that have been proven to be relevant and reliable, I am able to provide objective information to determine an individual's ability to work and earn wages.

81.     More specific to the fundamental details of the method I follow, the peer reviewed and generally accepted methodology for determining an individual's ability to work involves: Review medical records; gathering information from sources such as clinical interviews and medical consultation; Identify physical, and/or cognitive, and/or emotional limitations based upon the records reviewed; Comparing physical and cognitive limitations with how jobs are performed in the geographically relevant labor market by triangulating resources and/or performing job analyses in order to describe the physical, emotional, and cognitive demands required to perform a given job(s); Identify if a return to pre-injury level of participation in historically accessible job(s) based on transferable skills analysis; Exploring future employability which includes triangulating industry resources and/or performing labor market surveys/research to verify that the physical and cognitive demands required to perform a given job(s) match the physical and cognitive abilities of the client in relationship to their pre-injury skill; When not able to return to a historical job or transferable skills position(s), assessment and determination if it is possible or reasonable to recommend vocational retraining is considered; If not, determination of pre-injury earnings capacity at base line based on skills and ability is determined; Determination of post-injury earning capacity is then identified and in the case of Mr. Khamnoy is based on the loss of access to wage earning capacity based on his demonstrated skills and abilities pre and post-injury, with relationship to his special circumstances and compensation as a monk living and working in a Buddhist temple.

82.     Only in assessing these factors, can one correctly determine if an individual has a

GRUBE OREHOSKI, PLLC
1200 FIFTH AVE., STE 1711, SEATTLE, WA 98101
(206) 770-7606 | (206) 770-7607 (FAX)

reasonable chance of finding employment, becoming employed, and maintaining employment with consideration to their post injury impairments and with respect to their pre and post injury skills and abilities.

83.     The impact of Mr. Khamnoy's pre and post injury impairments are not solely a loss to the Buddhist temple, as the Defense asserts. To be precise, Mr. Khamnoy performs work for the temple in exchange for room and board. This is his compensation. The fact that Mr. Khamnoy has been unable to perform the full spectrum of his customary duties as a deputy monk and/or general monk represents a loss of value that is quantifiable through the application of the RAPEL methodology, my experience, and clinical judgment.

84.     Furthermore, Mr. Khamnoy is not a prisoner of the Buddhist Temple nor is the Buddhist Temple his permanent caretaker. Mr. Khamnoy testified that the effects of his injuries have caused him to contemplate how much longer he can be a monk[22]. In our clinical interview, Mr. Khamnoy plainly states Monks within the Temple that are unable to fulfill their day-to-day responsibilities, such has been the case for him, are eventually placed in assisted living or asked to leave to live with family.

85.     Given the nature and extent of his impairments, and based on his lack of formal education, his profound language and cultural barriers, his pre injury skills and abilities, Mr. Khamnoy has experienced a diminution in the value of his work as a monk in a best case scenario, and will have a complete loss in the value of his work in a worst case scenario if he is asked to leave the temple.

86.     **The Defense asserts:** "Moreover, even if there was a basis for such claims,

---

[22] Deposition of Aaron Khamnoy, Page 17 lines 2-9

DECLARATION OF JOHN CARY
3:19-CV-06223-BHS
23 OF 26

GRUBE OREHOSKI, PLLC
1200 FIFTH AVE., STE 1711, SEATTLE, WA 98101
(206) 770-7606 | (206) 770-7607 (FAX)

which there is not, they would require detailed calculations to reduce the claimed losses to present value. Plaintiff has not disclosed any economist to quantify these aspects for his claimed losses and these issues are outside Mr. Cary's expertise."

87.     **The Defense goes on to assert:** "Mr. Cary is precluded from testifying to the cost of the life care plan. …However, Mr. Cary is not an economist and is not qualified to reduce the cost of future care to present value. As such, he should be precluded from testifying to the cost of the life care plan because it contemplates future care."

88.     **Response:** One does not need to be an Economist to provide basic mathematical calculations on loss of earning capacity or costs associated with a life care plan in current dollars. OSC Vocational Systems, Inc. has others similar to me providing similar services and none of us have been excluded at trial. I have followed the standards of practice and methodology as noted above with regard to assessing the impact of Mr. Khamnoy's injury on his earning capacity based on skills and abilities and factoring in his medical conditions. Although I do not consider myself an Economist, this does not exclude me from performing analysis of lost earning capacity or calculating totals for a life care plan, which is routinely performed by myself, my colleagues at OSC, and others in the field of rehabilitation counseling and case management. One does not need to be an Economist to provide simple mathematical calculations.

89.     **The methodology for calculating earning capacity is as follows:** Conduct a clinical interview. Review medical records, including reference sources such as depositions. Identify physical, and/or mental, and/or cognitive limitations based upon the review medical records, interview, and referenced sources.

90.     **Assessing Impact of Physical Limitations:** Identify impact of physical limitations on various life roles including independent living, work/and earning capacity.

**GRUBE OREHOSKI, PLLC**
1200 Fifth Ave., Ste 1711, Seattle, WA 98101
(206) 770-7606 | (206) 770-7607 (fax)

Compare physical limitations with industry resources that describe the physical capacities required to perform a given job or jobs. Determine employability in pre injury jobs based on physical limitations.

91.     **Pre/Post Earning Capacity:** Determine pre-injury earnings base wage and in the case of Mr. Khamnoy the value of his work in the form of compensation for room and board and the value of his work in the general labor market based on published data routinely relied upon by rehabilitation counselors and case managers. Determine post-injury earning potential by using industry database of earnings for jobs that the post-injury client can actually perform or has lost access to, given the limitations identified[23]. Subtract actual or potential post-injury earnings from pre-injury earnings to determine the earning capacity differential.

92.     **The methodology for calculating a life care plan is as follows:** Review medical records and other sources such as depositions and client interviews and consultations. Identify needs listed as "Items" in the life care plan. Identify the "age initiated/age suspended" and "frequency" for replacement of each item. Identify the associated costs as derived from my day-to-day clinical practice, current providers and/or representative geographically-appropriate providers routinely available to Mr. Khamnoy now and in the future. Multiply "age initiated/age suspended" by "frequency" and "cost" to determine the base cost for each item. Add the base cost for each item to arrive at a total in current dollars.

93.     Again, as stated above one does not need to be an Economist to provide basic mathematical calculations. Myself, and my colleagues have provided such calculations in the

---

[23] It is important to note that utilization of published data, triangulated, and assessed with consideration to clinical judgment is routinely relied upon and not created for the purposes of assessing Mr. Khamnoy's earning capacity.

GRUBE OREHOSKI, PLLC
1200 FIFTH AVE., STE 1711, SEATTLE, WA 98101
(206) 770-7606 | (206) 770-7607 (FAX)

role of an expert, and none of us have been excluded at trial.

I HEREBY DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE STATE OF WASHINGTON THAT THE FOREGOING IS TRUE AND CORRECT.

Dated this 20 day of December, 2021.

John R. Cary, MA, CRC, CDMS

GRUBE OREHOSKI, PLLC
1200 FIFTH AVE., STE 1711, SEATTLE, WA 98101
(206) 770-7606 | (206) 770-7607 (FAX)